**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE** | : | |
| **COMMISSION,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL NO. 09-63** |
| | : | |
| **JOSEPH S. FORTE and** | : | |
| **JOSEPH FORTE, L.P.,** | : | |
| **Defendants.** | | |

| | | |
|---|---|---|
| **COMMODITY FUTURES TRADING** | : | |
| **COMMISSION,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL NO. 09-64** |
| | : | |
| **JOSEPH S. FORTE,** | : | |
| **Defendant.** | : | |

**Diamond, J.**                                                 **February 24, 2009**

### MEMORANDUM

Having consented to a freeze of his assets after the Government sued him for securities

fraud, Defendant Joseph S. Forte asks me to release funds so that he can pay various expenses.  I

deny his request.

**I.      Background**

A.      The Government's Allegations

On January 7, 2009, the Securities and Exchange Commission and the Commodity

Futures Trading Commission filed related actions, charging that Defendant had violated myriad

1

securities laws through his operation of a "Ponzi" scheme from 1995 to 2008.  (No. 09-63, Doc. No. 1; No. 09-64, Doc. No. 1.)  The Government based its allegations largely on statements Defendant purportedly made to investigators.  See, e.g., No, 09-63, Doc. No 1 ¶¶ 17, 22, 27.  As alleged, Defendant fraudulently solicited and accepted approximately $50 million from at least 76 investors through the sale of securities in the form of limited partnership interests in Joseph Forte, L.P.  (No. 09-63, Doc. No 1 ¶ 1; No. 09-64, Doc. No. 1 ¶ 1.)  Defendant acted as an unregistered commodity pool operator for Forte, L.P., purportedly representing to investors that the Limited Partnership would trade in futures contracts, including S&P 500 stock index futures.  (No. 09-63, Doc. No. 1 ¶ 2; No. 09-64, Doc. No. 1 ¶ 2.)

Contrary to those representations, Defendant invested only a small fraction of the $50 million in commodity futures.  (No. 09-63, Doc. No 1 ¶ 3.)  Those investments were, apparently, less than successful: from 1998 through 2008, Defendant sustained trading losses of more than $3 million.  (Id. ¶ 3.)

From 1995 through 2008, Defendant used between $15 and $20 million in pool participant funds to provide returns to other investors.  (Id. ¶ 3, 22.)  To conceal his alleged fraud and trading losses, Defendant falsely represented to investors that the pool was achieving annual returns of 20% to more than 36%, and that as of September 2008, the pool had increased in value to more than $154 million.  (Id. ¶ 4, 18, 24.)  Defendant reported paying himself more than $28 million in management and incentive fees during this period; the actual amount Defendant has admitted receiving is between $10 and $12 million.  (No. 09-64, Doc. No. 1 ¶ 4.)

B.      Procedural History

On January 7, 2009, the Government filed Emergency Motions for a Preliminary Injunction and an Order Freezing Assets, asking me to freeze "any funds or other assets presently held by [Joseph Forte or Forte, L.P.], under their control or over which they exercise actual or apparent investment or other authority, in whatever form such funds or other assets may presently exist and wherever located."  (No. 09-63, Doc. No. 2 ¶ I; No. 09-64, Doc. No. 2 ¶¶ II-III.)  The Government sought the asset freeze to preserve any remaining funds for: (1) the equitable remedy of disgorgement; and (2) the payment of civil penalties.  (No. 09-63, Doc. No. 1 at 8; Tr. Feb. 9, 2009 at 9-11.)

Defendant, who chose to proceed *pro se*, did not dispute the Government's allegations. Rather, he consented to the requested preliminary injunction and asset freeze.  (No. 09-63, Doc. Nos. 3-4; No. 09-64, Doc. No 3.)  After conducting a hearing, I entered the preliminary injunction and asset freeze Orders.  (No. 09-63, Doc. No. 5; No. 09-64, Doc. No. 4.)

Paragraph XI of the Consent Order in the SEC matter provides that nothing in that Order shall preclude Defendant "from petitioning the Court to release funds to him for living expenses, or . . . [preclude] the [SEC] from opposing any such request."  (No. 09-63, Doc. No. 5.)  On February 2, 2009, Defendant asked me to release funds so that he could pay monthly expenses, which he described as follows:

> Car insurance - 200
> Water - 50
> Heat & electric - 800
> Phones - 300
> Credit cards - 1800
> Mortgages - 5,000
> Health insurance - 1000

3

> Groceries - 1000
> Auto gas - 240
> Home maintenance - ?
> Home insurance - 100
> Misc. - 120
> College books - 400

(No. 09-63, Doc. No. 10 at 2; No. 09-64, Doc. No. 9 at 2.)  The Government opposed

Defendant's request because he: (1) had provided no verifying documentation; (2) did not specify

whether the identified expenses were recurring; and (3) "[w]ith respect to [the] source of funds to

be released, . . . fail[ed] to identify any account containing funds independent of the alleged

fraud."  (No. 09-63, Doc. No. 13 at 2; No. 09-64, Doc. No. 10.)

During a February 9, 2009 hearing, the Parties indicated that Defendant would submit

revised Motions that would include supporting documentation.  (Tr. Feb. 9, 2009 at 4.)

Accordingly, I denied Defendant's original Motions as moot.  (No. 09-63, Doc. No. 18; No. 09-

64, Doc. No. 14.)

Defendant filed revised Motions on February 9, 2009, asking me to release $16,222 to

pay overdue bills and $10,304.47 in monthly expenses.  Defendant includes an alternative

request: "If these amounts are not agreeable, please release amounts minus mortgages and credit

card payments."  Defendant has included documentation for some of the expenses and overdue

bills he seeks to pay.  The SEC and CFTC oppose any release of funds to Defendant.  In the

alternative, they ask me to "permit a monthly allotment of no more than $500 . . . . [which]

should suffice as a supplement to Mrs. Forte's income until such time that other household

members obtain employment."  (No. 09-63, Doc. No. 19 at 3; No. 09-64, Doc. No. 15.)

## II.    Legal Standards

"It is well settled that a district court has the authority in a securities fraud case to grant ancillary relief in the form of [an] order[] . . . temporarily freezing assets." SEC v. Coates, No. 94-5361, 1994 WL 455558, at * 1 (S.D.N.Y. Aug. 23, 1994) (citing SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1103, 1105 (2d Cir. 1972); see also SEC v. United Comms., Ltd., 899 F. Supp. 9, 11-12 (D.D.C. 1995). The purpose of an asset freeze is "to preserve the status quo by preventing the dissipation and diversion of assets." SEC v. Infinity Group Co., 212 F.3d 180, 197 (3d Cir. 2000); see also SEC v. ETS Payphones, Inc., 408 F.3d 727, 734 (11th Cir. 2005) (an asset freeze is "justified as a means of preserving funds for the equitable remedy of disgorgement"); SEC v. Duclaud Gonzalez de Castilla, 170 F. Supp. 2d 427, 429 (S.D.N.Y. 2001) ("[T]he primary purpose of freezing assets is to facilitate compensation of defrauded investors in the event a violation is established at trial . . . ."). The authority temporarily to freeze a defendant's assets carries with it the "corrolary authority to release frozen personal assets, or lower the amount frozen." Castilla, 170 F. Supp. 2d at 429 (citing S.E.C. v. Unifund SAL, 917 F.2d 98 (2d Cir. 1990)).

## III.    Discussion

In initiating securities litigation, the Government frequently obtains a court-ordered freeze of the defendant's assets. See, e.g., SEC v. Unifund SAL, 910 F.2d 1028, 1041 (2d Cir. 1990). In evaluating requests to release those assets, courts commonly look to several factors, all of which weigh strongly against releasing the funds Defendant requests.

A.      The Interests of The Defrauded Investors

Several courts have held that before they will unfreeze assets, the defendant must "establish that [the] modification is in the interest of the defrauded investors." SEC v. Grossman, 887 F. Supp. 649, 661 (S.D.N.Y. 1995) (denying release of funds to pay attorneys' fees and funeral and burial expenses), aff'd, 173 F.3d 846 (2d Cir. 1999).  For example, in some circumstances, maintaining a freeze "might thwart the goal of compensating investors if the freeze were to cause such disruption of defendants' business affairs that they would be financially destroyed."  SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1105 (2d Cir. 1972).

The release Defendant seeks is obviously not in the interest of those who invested in Forte, L.P.  First, Defendant seeks funds for his personal use only.  Moreover, it does not appear that the frozen assets will remotely cover the lost investments.  In its ongoing investigation, the Government has thus far discovered: (1) approximately $3,000 in assets of the Limited Partnership; (2) approximately $100,000 in liquid assets held personally by Defendant; and (3) other personal assets, including Defendant's shore house, which, when sold may yield approximately $500,000.  (Tr. Feb. 9, 2009 at 3, 6-7.)  These amounts represent approximately one percent of the total investor loss caused by Defendant's alleged fraud.  (Tr. Feb. 9, 2009 at 8.)  Given the paltry assets that remain to compensate Defendant's alleged victims, any release of funds seems unwarranted.  See FTC v. USA Fin., LLC, No. 08-899, 2008 WL 3165930, at *3 (M.D. Fla. Aug. 6, 2008) ("Where . . . the frozen assets fall far below the amount needed to compensate [investors], the court should exercise its discretion to deny a request to release funds for living expenses . . . .").

B.      Source of the Released Funds

Courts have unfrozen assets that were demonstrably not the product of the defendant's alleged fraud.  See, e.g., SEC v. Bremont, 954 F. Supp. 726, 733 (S.D.N.Y. 1997).

Here, despite the Government's repeated requests, Defendant has presented no evidence that any of his frozen assets are derived from sources other than investor funds.  See No. 09-63, Doc. No. 13 at 1-2.  In any event, because it appears likely that the investor losses dwarf Defendant's remaining assets, even if Defendant could show that some of the frozen funds are from "untainted" sources, I would not release those funds.  See, e.g., SEC v. Current Fin. Servs., 62 F. Supp. 2d 66, 68 (D.D.C. 1999) (refusing to release personal funds not traceable to the fraud because defendant's liability exceeded the total funds frozen); SEC v. Roor, No. 99-3372, 1999 WL 553823, at *3 (S.D.N.Y. July 29, 1999) (denying motion to release funds from mortgage of property that pre-existed alleged fraud); Grossman, 887 F. Supp. at 661 ("It is irrelevant whether the funds affected by the Asset Freeze are traceable to the illegal activity . . . .").


C.      Balance of Interests

Courts have released modest amounts of frozen funds after balancing "[t]he defendant's interest in having access to funds needed to pay ordinary and necessary living expenses  . . . against the government's interest in preventing the depletion of potentially forfeitable assets." SEC v. Dobbins, No. 04-605, 2004 WL 957715, at *3 (N.D. Tex. Apr. 14, 2004) (quoting United States v. Thier, 801 F.2d 1463, 1474 (5th Cir. 1987)).  In determining whether to release funds for necessary living expenses, these courts have first "look[ed] for evidence of the defendant's

7

overall assets or income." SEC v. Dowdell, 175 F. Supp. 2d 850, 854 (W.D. Va. 2001). That is not possible here because of Defendant's recalcitrance.

My January 7th Orders -- to which Defendant consented -- required him to provide the Government by January 17th with a full, verified accounting of all assets held by him, his spouse, and any member of his household. See No. 09-63, Doc. No. 4 ¶ V. As he admitted during the February 9th hearing, Defendant has yet to provide this information. (Tr. Feb. 9, 2009 at 5.) In addition, although Defendant reports that his spouse has obtained employment with a monthly salary of $1,500 and that his children (two of whom are over eighteen years old) are currently seeking employment, he has not offered any evidence regarding his own efforts to secure employment. Nor has Defendant stated whether he has access to funds from friends and other family members. In these circumstances, the balance of the interests weighs against Defendant's request for a release of funds. See SEC v. Schiffer, No. 97-5853, 1998 WL 901684, at * 3 (S.D.N.Y. June 25, 1998) (denying request to modify asset freeze because the defendants' failure to submit a full accounting "warranted a measure designed to preserve the status quo while the court could obtain an accurate picture of the whereabouts of the proceeds of the [alleged fraud]").

D.      The Expenses Defendant Seeks to Pay

Courts have also considered whether the defendant is "requesting funds for luxuries . . . [rather than] necessities." Dowdell, 175 F. Supp. 2d at 854. Defendant has submitted documentation showing that among the expenses he seeks to pay with released assets are the following:

(1)     approximately $3,000 a month for mortgage payments, apparently for more than one home;

(2)     approximately $150 a month for premium satellite television service -- including "NFL Sunday Ticket" and special HD service ($324.14 overdue);

(3)     approximately $400 a month for several cellular telephones ($2,107.64 overdue);

(4)     approximately $220 a month for home phone lines and high speed internet service; and

(5)     $2,378 a month to make minimum payments on approximately $65,000 in existing credit card debt ($4,021 overdue).


I find it astonishing and disturbing that Defendant has included these in his request for "necessary" living expenses.  Other courts have refused to release funds to pay similar expenses. See, e.g., Dobbins, 2004 WL 957715, at *3 (refusing to unfreeze funds to pay approximately $11,000 per month in living expenses, where the defendant's budgeted items included cable television, church contributions, and automobile financing); Dowdell, 175 F. Supp. 2d at 855 (refusing to unfreeze funds to permit the defendant to pay a credit card company); Castilla, 170 F. Supp. 2d at 429 (refusing to unfreeze funds to pay salaries of nanny, housekeeper, handyman and nurse); Coates, 1994 WL 455558, at *2 (refusing to unfreeze funds where the defendant's request included "extraordinary items such as expensive hair care, lawn service . . . , pool service, and cable television," and where some of the expenses appeared to be based on "unrepresentatively high bills").

It also appears that Defendant seeks excessive amounts to pay for what might normally be regarded as "necessities."  For example, Defendant requests: $1,100 a month for heat, electricity, and water, apparently for more than one home ($3,219.15 overdue); and $300 a month to buy gasoline for several vehicles.  Defendant has not explained the need for several vehicles, especially when only one member of his family is currently employed.  Nor do I deem a necessity the amounts requested to provide heat, electric, and water for more than one home.

For other expenses, Defendant has failed to submit any documentation specifying or verifying the amounts requested.  See Dobbins, 2004 WL 957715, at *3 (refusing to unfreeze funds where the defendant's request included "$2,000 for unspecified and unsupported 'food, clothing, doctor, personal care, incidental expenses, general upkeep, maintenance, and repairs'").  For example, Defendant does not offer any documentation breaking down the $65,000 in credit card debt.  He seeks $100 a month for "[h]ome insurance," but provides no supporting documentation.  Finally, he states that he "will need approximately $1,500 per month" for health insurance, but provides no substantiating documentation.  Moreover, Defendant has not indicated whether health insurance is available through his spouse's employer.

It thus appears that Defendant has not limited his requests to necessary living expenses and has failed to provide documentation supporting those requests that might be necessary.  In these circumstances, the expenses Defendant seeks to pay weigh against releasing funds.

**IV.     Conclusion**

All the applicable criteria weigh against releasing the funds Defendant requests.

Accordingly, I am compelled to deny his Motions.

Appropriate Orders follow.

*s/ Paul S. Diamond*

_____

**Paul S. Diamond, J.**

11