IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : : | |
| Plaintiff, | : : | |
| v. | : : | CIVIL NO. 09-63 |
| JOSEPH S. FORTE and JOSEPH FORTE, L.P., | : : : | |
| Defendants. | : | |

| | | |
|---|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | : : | |
| Plaintiff, | : : | |
| v. | : : | CIVIL NO. 09-64 |
| JOSEPH S. FORTE, | : : | |
| Defendant. | : | |

**Diamond, J.**                                                                 **December 15, 2009**

## MEMORANDUM

Ponzi schemes are pernicious because they masquerade as legitimate investments. In fact, only a very few early "investors" recover their principal and earn profit – paid entirely from the monies provided by later "investors," who commonly lose everything. It appears that this is what happened to those who invested in the Partnership created by Defendant Joseph S. Forte. Forty-one early investors provided Forte with some $32 million in principal and recouped some $41 million as return of principal and profits, all paid by eighty-three later investors, who recouped nothing. On March 30, 2009, I granted the request of the Securities and Exchange

1

Commission and the Commodity Futures Trading Commission to appoint a Receiver to determine, *inter alia*, what assets she could recover for redistribution to Mr. Forte's victims.

Counsel for the Receiver has submitted for my approval Consent Orders settling the Receiver's fraudulent conveyance claims brought against two of Forte's early investors under the Pennsylvania Uniform Fraudulent Transfer Act. See 12 Pa. C.S.A. § 5101 *et seq*. The Orders provide that both investors will repay some $220,000 in "net winnings," or profits from the Ponzi scheme, but none of the $765,000 principal they invested with Forte. Counsel for the Receiver explains that he intended to pursue both the principal and the profits as PUFTA allows, but was deterred when the SEC and CFTC stated that they would oppose any such action. *Letter from Lawrence T. Hoyle, Jr. to the Honorable Paul S. Diamond, U.S. District Judge (December 2, 2009)*. Neither the SEC nor the CFTC has disclosed to me why it has taken this position. Counsel recommends that I approve these Consent Orders because litigating against the SEC and the CFTC would likely consume the principal amount he seeks to recover, and because these "icebreaker" settlements will benefit the Receivership Estate. Although the position of the SEC and the CFTC does not have clear legal support and denies Forte's victims a possible avenue of recovery, I will nonetheless reluctantly approve the Consent Orders.

**I.     Background**

    A.     The Government's Allegations

On January 7, 2009, the SEC and the CFTC filed related actions, charging that Forte and his Limited Partnership, Joseph Forte, L.P., had violated myriad securities laws through Forte's operation of a Ponzi scheme from 1995 to 2008. *(No. 09-63, Doc. No. 1; No. 09-64, Doc. No. 1.)* The agencies based their allegations largely on Forte's own admissions. *See, e.g., No, 09-63,*

*Doc. No. 1 ¶¶ 17, 22, 27.* Forte fraudulently solicited and accepted more than $100 million through the sale of securities in the form of limited partnerships in Joseph Forte, L.P. *(No. 09-63, Doc. No. 1 ¶ 1; No. 09-64, Doc. No. 1 ¶ 1.)* Forte acted as an unregistered commodity pool operator for Forte, L.P., purportedly telling investors that the Limited Partnership would trade in futures contracts, including S&P 500 stock index futures. *(No. 09-63, Doc. No. 1 ¶ 2; No. 09-64, Doc. No. 1 ¶ 2.)*

Contrary to his representations, Forte invested only a fraction of the money in commodity futures. *(No. 09-63, Doc. No. 1 ¶ 3.)* Those investments were, apparently, less than successful. From 1995 through 2008, Forte nonetheless returned some $41 million in pool participant funds to his early investors. *(Id. ¶ 3, 22.)* Forte falsely represented that the pool was earning between 20% to over 36% in annual returns, and that as of September 2008, the pool had increased in value to more than $154 million. *(Id. ¶ 4, 18, 24.)* In fact, Forte paid himself and his early investors with monies provided by Forte L.P.'s later investors. *(No. 09-64, Doc. No. 1 ¶ 4.)*

On May 5, 2009, Forte was charged with wire fraud, mail fraud, bank fraud, and money laundering. (See United States v. Forte, Case No. 09-304, Doc. No. 13.) On November 24, 2009, after he pled guilty to all charges, Forte was sentenced to a term of fifteen years imprisonment. (Id., Doc. No. 35.)

B.    Procedural History

On January 7, 2009, the SEC and the CFTC filed Emergency Motions for a Preliminary Injunction and an Order Freezing Assets, asking me to freeze "any funds or other assets presently held by [Joseph Forte or Forte, L.P.], under their control or over which they exercise actual or apparent investment or other authority, in whatever form such funds or other assets may presently

exist and wherever located." *(No. 09-63, Doc. No. 2 ¶ I; No. 09-64, Doc. No. 2 ¶¶ II-III.)* The agencies sought to preserve any remaining funds for: (1) the equitable remedy of disgorgement; and (2) the payment of civil penalties. *(No. 09-63, Doc. No. 1 at 8; Tr. Feb. 9, 2009 at 9-11.)*

Forte, who chose to proceed *pro se*, did not dispute the agencies' allegations, and consented to the relief sought. *(No. 09-63, Doc. Nos. 3-4; No. 09-64, Doc. No 3.)* After conducting a hearing, I entered the preliminary injunction and asset freeze Orders. *(No. 09-63, Doc. No. 5; No. 09-64, Doc. No. 4.)* In February, I denied Forte's request to release funds with which he could pay his personal expenses. *(No. 09-63, Doc. No. 21; No. 09-64, Doc. No. 18.)* On September 30, 2009, Forte consented to a permanent injunction and asset freeze. *(No. 09-63, Doc. No. 34; No. 09-64, Doc. No. 32.)*

On March 17, 2009, the SEC and the CFTC filed an unopposed Motion to appoint a joint Receiver and Counsel to preserve, protect, and assume control of the assets of Defendants Forte, L.P. and Joseph S. Forte and to maximize any possible recovery to the defrauded investors. *(No. 09-63, Doc. No. 22; No. 09-64, Doc. No. 21.)* At the SEC's request, I appointed as Receiver Marion A. Hecht, Managing Director of the Forensic Litigation and Valuation Division of Goodman & Company, L.L.P. *(No. 09-63, Doc. No. 26 ¶ II; No. 09-64, Doc. No. 24 ¶ II.)* My Order provided that the Receiver was authorized to retain Lawrence T. Hoyle, Jr. and the Hoyle Law Firm to serve as Counsel. <u>Id.</u> Paragraph X.P of the Order requires that before the Receiver initiates any action against Forte's limited partners, she must consult with the SEC and the CFTC. <u>Id.</u> ¶ X.P.

On August 27, 2009, the Receiver submitted her first Report summarizing the steps she had taken to assume control of the Receivership Assets. *(No. 09-63, Doc. No. 33; No. 09-64,*

*Doc. No. 31.*) The Receiver stated that from a total of 124 investors, eighty-three lost all the money they had given to Forte – approximately $34 million. The Receiver also noted that forty-one investors were "net winners" who collectively received $8,563,928 more than their original investments. *Id.* The Receiver demanded that these net winners return their false profits. *Id.*

  C.  Proposed Consent Decrees

  On December 3, 2009, Mr. Hoyle submitted for my approval two proposed Consent Orders that would settle the Receiver's PUFTA fraudulent conveyance claims against two of Forte L.P.'s early investors, Allen L. Greenough and F. Gibbs LaMotte. Mr. Greenough invested $335,000 in Forte L.P. between 1997 and 2003, and by 2008 had received profits of $95,466 (in addition to the return of his principal). Mr. LaMotte invested $430,000 between 2001 and 2008, and earned the return of that principal as well as profits of $122,424. Of the forty-one net winners identified by the Receiver, only Greenough and LaMotte have agreed to return their full profits to the Receivership Estate. The Consent Orders provide that in return, the Receiver will not seek the return of their principal investments unless she learns any facts casting doubt on their good faith.

  Mr. Hoyle has explained that the Receiver's decision to collect Greenough's and LaMotte's net winnings but not their principal was the result of a disagreement with the SEC and the CFTC. *See Hoyle Letter at 3-4.* As I explain below, under PUFTA, Greenough and LaMotte could be required to return their principal investments to the Estate if it is shown that when investing in Forte L.P., they should have seen "red flags" that the Partnership was "too good to be true." According to Mr. Hoyle, the SEC and the CFTC take the far more restrictive view that "claims for principal should be asserted only against limited partners as to whom there is

individualized evidence" that they were alerted to the Ponzi scheme nature of the Limited Partnership. *Id.* at 4.

Mr. Hoyle explains that "the Receiver originally contemplated, as PUFTA provides, filing suit to recover the entire fraudulent transfer from all Limited Partner net winners" - both the profits *and* the principal. *Hoyle Letter at 3.* The Receiver outlined her litigation plans to the SEC and the CFTC to determine whether they objected, as Paragraph X.P of my Order appointing her required. *(No. 09-63, Doc. No. 26 ¶ X.P; No. 09-64, Doc. No. 24 ¶ X.P.)* The SEC and the CFTC informed the Receiver that should she "file any such suits, [the agencies] will litigate the issue before this Court and, if necessary, before the Third Circuit." *Hoyle Letter at 4.* The SEC took this same position before the Fifth Circuit in a another Ponzi scheme case. See Janvey v. Alguire, No. 09-10761, 2009 WL 2791623 (5th Cir. Nov. 13, 2009).

Mr. Hoyle recommends that I approve the Consent Orders because the cost of litigating against the SEC and the CFTC would likely consume the sum that the Receivership Estate might recover from Greenough and LaMotte. *Hoyle Letter at 4.* Moreover, Mr. Hoyle believes that approving these "ice-breaker settlements" with Greenough and LaMotte will demonstrate that the Receiver is willing to settle claims in a cost-effective manner and might persuade other net winners to settle rather than litigate. *Id.*

Neither the SEC nor the CFTC has responded to Mr. Hoyle's December 3rd letter, taken a position on the proposed Consent Orders, or otherwise explained to me why it opposes any attempt to recover Greenough's or LaMotte's principal.

**II.     Legal Standards**

In a receivership proceeding, district courts have wide discretion to fashion distribution plans to recover investors' lost assets.  SEC v. Infinity Group Co., 226 Fed. Appx. 217, 218 (3d Cir. 2007); SEC v. Fischbach, 133 F.3d 170, 175 (2d Cir. 1997).

When claims are brought against Ponzi scheme investors, "the general rule is that to the extent innocent investors have received payments in excess of the amounts of principal that they originally invested, those payments are avoidable as fraudulent transfers." Donell v. Kowell, 533 F.3d 762, 770 (9th Cir. 2008); In re United Energy Corp., 944 F.2d 589, 596 (9th Cir. 1991) (Ponzi scheme winners should not be permitted to "enjoy an advantage over later investors sucked into the Ponzi scheme who were not so lucky.")  See also SEC v. Infinity Group Co., 993 F. Supp. 324, 331-32 (E.D. Pa. 1998), aff'd, 212 F.3d 180 (3d Cir. 2000) (disgorging innocent third parties' gains in a Ponzi scheme for distribution to defrauded investors).

A receiver's legal entitlement to recover a winning investor's profits is thus well-settled; her entitlement to recover that investor's principal is less clear.  Although the Third Circuit has not addressed the issue, several courts have ordered that winning investors' profits and principal should be divided *pro rata* among all investors.  See SEC v. George, 426 F.3d 786, 798-99 (6th Cir. 2005) (ordering winning investors to return profits and principal because "hundreds of other investors were victimized by this scheme, yet they will recover only 42 percent of the money they invested, not the 100 percent to which the relief defendants claim to be entitled"); SEC v. Credit Bancorp, Ltd., 290 F.3d 80, 89 (2d Cir. 2002) ("[T]he use of a pro rata distribution has been deemed especially appropriate for fraud victims of a 'Ponzi scheme,' . . . in which earlier investors' returns are generated by the influx of fresh capital from unwitting newcomers rather

7

than through legitimate investment activity.") Other courts have held that a receiver has no claim to a net winner's principal because he was an "innocent investor." See Donell, 533 F.3d at 780l; Scholes v. Lehmann, 56 F.3d 750, 757-58 (7th Cir. 1995).

The Pennsylvania Uniform Fraudulent Transfer Act authorizes a receiver to recover both profit and principal from winning investors in certain circumstances. 12 Pa. C.S.A. § 5101 *et seq*. For instance, a receiver may, pursuant to the statute's "actual fraud" provision, allege that the Ponzi scheme operator made transfers to the winning investor "with actual intent to hinder, delay or defraud" the losing investors. 12 Pa. C.S.A. § 5103(a). Significantly, the mere existence of a Ponzi scheme is sufficient to establish "actual intent to defraud." Donell, 533 F.3d at 770. The receiver alleging fraud may thus recover the entire amount paid to the winning investor, including principal. Id.

An innocent winning investor in a Ponzi scheme may retain his principal through the demonstration of "good faith." 12 Pa. C.S.A. § 5108(d). This affirmative defense requires that the winning investor to establish (1) his innocence, and (2) an exchange of fair value (always satisfied in Ponzi scheme cases, because the principal was both invested and returned). In re Burry, 309 B.R. 130, 135 (Bankr. E.D. Pa. 2004). Because a "good faith" defense requires the court to determine whether the investor had "sufficient knowledge to place [him] on inquiry notice of the voidability of the transfer," courts typically assess whether the investors ignored "red flags" revealing the true nature of the challenged investment. Id. at 136. If the court determines that the investor should have known the investment was "too good to be true," it will void the return of principal to the investor. Donell, 533 F.3d at 770.

**III.     Discussion**

The SEC and CFTC have apparently adopted a nationwide policy that there can be no recovery of principal from winning Ponzi scheme investors even when the investors should have seen "red flags" alerting them to the true nature of their "investments." The SEC and the CFTC apparently believe that "claims for principal should be asserted only against [investors] as to whom there is individualized evidence that they were on inquiry notice with respect to the operations of the [Ponzi scheme], in addition to the red flags known to all [investors]." *Hoyle Letter at 4*. In imposing this "*mens rea*" requirement, the SEC and the CFTC have effectively limited the Receiver's recovery of principal to those winning investors who shared Joseph Forte's criminal intent. Because the winning investors' returned principal is actually the losing investors' money, those losing investors could well view the position of the SEC and the CFTC as extraordinarily unfair.

Once again, neither the SEC nor the CFTC has responded to Mr. Hoyle's December 3rd letter. The *amicus* brief filed by the SEC in Janvey v. Alguire offers some insight, however, into the agency's position. In that case, R. Allen Sanford created a $8.3 billion Ponzi scheme through the sale of fraudulent certificates of deposit. Like Forte (and every other Ponzi scheme operator), Stanford paid profit and principal to his early investors with the money contributed by later investors. When the Receiver in that case sought to recoup the early investors' principal, the agency objected. Janvey v. Alguire, 2009 U.S. App. LEXIS 25013 (5th Cir. Nov. 13, 2009). The SEC argued to the Fifth Circuit that "[t]he receiver's claims to recover principal lack statutory and case law support, and it would be inequitable to require the innocent investors in these cases to repay these amounts." Brief of the SEC as *Amicus Curiae* at 9, Janvey v. Alguire, 2009 U.S.

App. LEXIS 25013 (5th Cir. 2009) (No. 09-10765). The SEC further contended that any claims for principal under fraudulent transfer law would fail because "it is undisputed that the Investor Defendants received the principal payments in good faith." Id. at 14.

Assuming the SEC would offer the same arguments here, they are not entirely correct. First, as I have shown, there is "statutory and case law support" for the Receiver's recovery of principal. In any event, I agree with the SEC that truly "innocent" investors who acted "in good faith" should not be compelled to return their principal to the Receivership Estate. It does not appear, however, that Mr. Hoyle or the Receiver seek such a result. Rather, they could recoup principal only when an investor is not "innocent" or has not acted in "good faith." See In re Burry, 309 B.R. at 135 (a defendant who has "sufficient knowledge to place [him] on inquiry notice of the voidability of the transfer" does not meet the "good faith" test). If Mr. Hoyle is successful, this would allow the Receiver to increase significantly the funds she could distribute *pro rata* to *all* Mr. Forte's victims. See Cunningham v. Brown, 265 U.S. 1, 13 (1924) (ordering a *pro rata* distribution of all recoverable funds to all Ponzi scheme victims); SEC v. Credit Bancorp, Ltd., 290 F.3d 80, 89 (2d Cir. 2002) ("Courts have favored pro rata distribution of assets where, as here, the funds of the defrauded victims were commingled and where victims were similarly situated with respect to their relationship to the defrauders.") Accordingly, it could well be more equitable and legally supportable for the SEC and the CFTC to support the Receiver's original plan: "as PUFTA provides, [to file] suit to recover the entire fraudulent transfer from all Limited Partner net winners" - both the profits *and* the principal. *See Hoyle Letter at 3*.

In other circumstances, I would be inclined to disapprove the proposed Consent Decrees. Here, however, Mr. Hoyle fears that the costs of litigating against the SEC and the CFTC and Greenough and LaMotte could well exceed the principal the Receiver could recover. *Hoyle Letter at 4*. Moreover, Mr. Hoyle believes that these "ice-breaker settlements" may encourage other winning investors to resolve the Receiver's claims without costly litigation. Id. In these circumstances, I believe approval of the proposed Consent Orders is in the best interest of Mr. Forte's victims. I do not address, however, whether the same result would obtain if I were asked to approve a similar settlement with a winning Forte investor who received a greater return of principal than Greenough or LaMotte.

## IV. Conclusion

For the reasons I have discussed, I will reluctantly approve the proposed Consent Decrees with Allen L. Greenough and F. Gibbs LaMotte.

BY THE COURT.

*/s/ Paul S. Diamond*

_____
**Paul S. Diamond, J.**