**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | |
| **Plaintiff,** | : | |
| **v.** | : | **CIVIL NO. 09-63** |
| **JOSEPH S. FORTE and JOSEPH FORTE, L.P.,** | : | |
| **Defendants.** | : | |

| | | |
|---|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,** | : | |
| **Plaintiff,** | : | |
| **v.** | : | **CIVIL NO. 09-64** |
| **JOSEPH S. FORTE,** | : | |
| **Defendant.** | : | |

**Diamond, J.** **March 17, 2010**

**MEMORANDUM**

In this "Ponzi scheme" litigation, the Receiver supervising the recovery of assets on behalf of defrauded investors has submitted for my approval a Consent Order settling her potential claims against two "winning" investors. Because the Receiver has not had the opportunity to conduct an adequate individualized investigation as to whether the winning investors acted in good faith, I will disapprove the proposed Order without prejudice.

## I. Background

### A. The Government's Allegations

On January 7, 2009, the Securities and Exchange Commission and the Commodity Futures Trading Commission filed related actions, charging Defendant Joseph S. Forte and his Limited Partnership, Joseph Forte, L.P., with violating myriad securities laws through Forte's operation of a Ponzi scheme from 1995 to 2008. See *No. 09-63, Doc. No. 1; No. 09-64, Doc. No. 1;* Cunningham v. Brown, 265 U.S. 1, 13 (1924). The agencies based their allegations largely on Forte's admissions and related investment documents. See, e.g., *No. 09-63, Doc. No. 1 ¶¶ 17, 22, 27.* It now appears that Forte fraudulently solicited and accepted original cash investments of $78.6 million from 125 investors through the sale of securities in the form of limited partnerships. Forte falsely represented that the investments were earning annual returns of 18% to over 38%, and that as of September 2008, the investments had increased in value to more than $154 million. *(Id. ¶ 4, 18, 24.)* In fact, Forte paid himself and his early investors with monies provided by Forte L.P.'s later investors. *(No. 09-64, Doc. No. 1 ¶ 4.)* Of the 125 investors, forty-one were "net winners" who recovered their full $22.2 million principal payments as well as $8.6 million in "profits." *See No. 09-63, Doc. No. 49, Ex. 2.* Eighty-four investors lost a total of $34.8 million from their original investments of $56.4 million. *Id.*

On November 24, 2009, after he pled guilty to wire fraud, mail fraud, bank fraud, and money laundering charges, Forte was sentenced to a term of fifteen years imprisonment. See United States v. Forte, Case No. 09-304, Doc. No. 35.

**B. Procedural History**

On January 7, 2009, the SEC and the CFTC sought emergency injunctive relief, asking me, *inter alia*, to freeze "any funds or other assets presently held by [Joseph Forte or Forte, L.P.], under their control or over which they exercise actual or apparent investment or other authority, in whatever form such funds or other assets may presently exist and wherever located." *(No. 09-63, Doc. No. 2 ¶ I; No. 09-64, Doc. No. 2 ¶¶ II-III.)* Forte did not dispute the agencies' allegations, and, on September 30, 2009, consented to a permanent injunction and asset freeze. *(No. 09-63, Doc. No. 34; No. 09-64, Doc. No. 32.)*

On March 17, 2009, I granted the agencies' unopposed Motion to appoint Marion A. Hecht as Receiver of the Limited Partnership Estate. *(No. 09-63, Doc. No. 26 ¶ II; No. 09-64, Doc. No. 24 ¶ II.)* My Order provided that the Receiver was authorized to retain Lawrence T. Hoyle, Jr. to serve as Counsel. *(Id.)* The Order requires that before the Receiver initiates any litigation against Forte's limited partners, she must consult with the agencies. *(Id. ¶ X.P.)* If the SEC or CFTC objects to any such action, the Receiver must seek leave of Court to file her complaint under seal. The agencies will then have five days to present their objections – also filed under seal – to the Court. *(Id.)*

On August 27, 2009, the Receiver submitted her first Report summarizing the steps she had taken to assume control of the Receivership Assets. *(No. 09-63, Doc. No. 33; No. 09-64, Doc. No. 31.)* The Receiver demanded that Forte's "net winners" return to the Receivership Estate their $8.6 million in false profits. *(Id.)*

On December 3, 2009, Mr. Hoyle submitted for my approval two proposed Consent Orders that would settle the Receiver's claims brought under the Pennsylvania Uniform

Fraudulent Transfer Act against two of Forte L.P.'s early investors: Allen L. Greenough and F. Gibbs LaMotte. See *No. 09-63, Doc. Nos. 38, 39; No. 09-64, Doc. Nos. 36, 37*; 12 Pa. C.S.A. § 5101 *et seq*. Mr. Greenough invested $335,000 in Forte L.P. between 1997 and 2003, and, by 2008, had received "profits" of $95,466 (in addition to the return of his principal). *(Id.)* Mr. LaMotte invested $430,000 between 2001 and 2008, and earned the return of that principal as well as $122,424 in "profits." *(Id.)* The Consent Orders provided that the Receiver would not seek to recover Greenough or LaMotte's principal investments unless she learned any facts casting doubt on either man's good faith. *(Id.)*

In a letter accompanying the proposed Consent Orders, Mr. Hoyle explained that the Receiver's decision to collect these net winnings, but not the principal, was the result of a disagreement with the SEC. *See Doc. No. 36 (Letter from Lawrence T. Hoyle, Jr. to the Court (December 2, 2009)*). Under PUFTA, Greenough and LaMotte could be required to return their principal investments to the Estate if it were shown that when investing in Forte L.P., they should have seen "red flags" that the Partnership was "too good to be true." According to Mr. Hoyle, the SEC took the far more restrictive view that "claims for principal should be asserted only against limited partners as to whom there is individualized evidence" that they were aware of the true nature of the Limited Partnership. *Id. at 4.*

Mr. Hoyle explained that "the Receiver originally contemplated, as PUFTA provides, filing suit to recover the entire fraudulent transfer from all Limited Partner net winners" - both the profits *and* the principal. *Id. at 3.* The SEC informed the Receiver that should she "file any such suits, [the agencies] will litigate the issue before this Court and, if necessary, before the Third Circuit." *Id. at 4.*

Because Mr. Hoyle feared that the cost of such litigation might exceed the principal the Receiver could recover, he recommended that I approve these "ice breaker" settlements. I reluctantly accepted his recommendation, explaining in a December 15, 2009 Memorandum that the SEC's position did not have clear legal support and denied Forte's victims a possible avenue of recovery. *(Case No. 09-63, Doc. No. 37; Case No. 09-64, Doc. No. 35.)* I noted that I might not approve a similar settlement with a winning Forte investor who received a greater return of principal than Greenough or LaMotte. *(Id. at 11.)*

On March 1, 2010, the Receiver submitted her Second Report summarizing her efforts to assume control of the Receivership Assets. *(Case No. 09-63, Doc. No. 49; Case No. 09-64, Doc. No. 47.)* Since filing her First Report, the Receiver had learned that Forte's later investors lost almost $35 million dollars and that his earlier investors received some $8.6 million in false profits (in addition to repayment of their principal of some $22.2 million). *(Id., Ex. 2.)* Unfortunately, it does not appear at present that the Receiver will be able to recover anything close to the $35 million needed to make the defrauded investors whole. According to her Second Report, the Receiver has collected $359,616 from the sale of the Fortes' household items, the return of Forte's charitable donations, and the like. (*Id., Ex. 1.)* She has also collected most of the $547,383 owed by five "net winners" – including Greenough and LaMotte – for a total recovery of $985,103. The Receiver intends to recover approximately $450,000 from the sale of real property, and intends to pursue the recovery of an additional $3 million from entities to whom Forte gave gifts. *(Id. at 4-5.)* She also expects to sell severely depreciated interests in sixteen startup companies, four of which she has already determined are worthless. *(Id. at 15.)* The Receiver has demanded that John Irwin, the accountant for the Limited Partnership, and his

company, Jacklin Associates, Inc., repay the $35 million lost by Forte's victims, but has not yet initiated litigation efforts to this end, and has not indicated whether Irwin or Jacklin can pay this amount (assuming she can establish liability). *(Id. at 26.)*

**C. The Instant Proposed Consent Order**

On March 12, 2010, Mr. Hoyle submitted for my approval a proposed settlement with Bernard and Norma Raevsky, who invested $1,516,444 with Forte L.P. – the third-largest Limited Partnership investment – and received a return of that principal as well as $277,705 in false profits. *Letter from Lawrence T. Hoyle, Jr. to the Court (March 12, 2010).* The proposed Consent Order provides that the Raevskys would pay the Receiver $277,705 in installments. *See id., Ex. A, at 4.* The Order also provides that the Receiver would release the Raevskys from all legal claims, unless the Receiver "become[s] aware of facts contradicting the Raevskys' representation that they received payments of [p]rincipal from the Partnership in good faith and for fair value." *Id. at 4.*

On March 15, 2010, I held a hearing to determine whether to approve the proposed Consent Order. I reiterated the concern I had expressed in my December 15th Memorandum that the Receiver apparently did not intend to seek return of the winning investors' principal – here, some $1.5 million. *(Tr. 3-4.)* The Receiver acknowledged that she had not conducted individualized discovery with respect to the Raevskys, but believed that the immediate recovery of the Raevskys' $277,705 in false profits was in the best interest of the Receivership Estate. *(Tr. 3-4.)*

The SEC also acknowledged that aside from reviewing financial documents, it had conducted no individualized discovery respecting the Raevskys. *(Tr. 6)* ("[T]here [have] been

no depositions and there has been no discovery specifically of the Raevskys."). The SEC nonetheless informed me that its "staff is currently unaware of any facts discovered by the Receiver, or evident from the Commission's initial investigation of this matter, that call into question the Raevsky[s'] representation that they took the payments they received from Joseph Forte, L.P. for the principal in good faith and for fair value as defined by § 5108(a) of the Pennsylvania Fraudulent Transfer Act." *(Case No. 09-63, Doc. No. 52 at 1.)* The SEC stated at the hearing that it would oppose any effort by the Receiver to prosecute a claim against the Raevskys to recover their principal investment. *(Tr. 10.)* The Commission stated that it would "continue to support the Receiver in the type of individualized discovery outlined on Page 4 of [Mr. Hoyle's] December 3, 2009 letter to the Court." *(Case No. 09-63, Doc. No. 52 at 4.)* This was a surprising statement, given that the SEC's objection to recovering investor principal had compelled the Receiver and Mr. Hoyle to refrain from conducting what I would consider to be "individualized discovery" with respect to any of the limited partners. To eliminate any confusion, at the March 15th hearing, I asked the Commission if it would allow individualized discovery – such as depositions – to help Mr. Hoyle and the Receiver determine whether the Raevskys should be required to return their $1.5 million in principal investment. *(Tr. 13.)* Commission counsel responded: "Absolutely. We have allowed discovery to go forward in the context of the Receivership Order." *(Id.)*

**D. The "Red Flags"**

Pursuant to my Order of March 16th, Mr. Hoyle has submitted a list of factors and incidents that he believes should have put Forte's investors on "inquiry notice" with respect to

the true nature of the Limited Partnership. *(Case No. 09-63, Doc. No. 54.)* Included in the list are the following:

- There was not a single quarter during which Joseph Forte, L.P. lost money;
- On the contrary, throughout its existence, the Limited Partnership reported unrealistically high rates of return – between 18% and 38%;
- Forte provided the Limited Partnership with account statements printed on plain white paper without cover letters, letterhead, or other identifying features;
- Although Forte represented that the Partnership's assets were completely liquid, the Partnership repeatedly bounced checks and was unable to provide cash distributions on demand;
- The Partnership's accounting was riddled with errors; and
- The Partnership apparently was never audited, and its only accountant was also a Limited Partner.

*(Id. at 1-3.)* Significantly, Mr. Hoyle has submitted evidence that these "red flags" so disturbed at least one individual that he refused to invest in the Partnership:

> I can't send [Forte] my money, because in the one in a million chance all is "not as reported," it wipes out our entire family's assets. *I don't send this to you to get you all worried . . ., but I am re[]miss if I don't give you my concerns*.

*(Id. Ex. 1.) (emphasis supplied).*

## II. Legal Standards

In my December 15th Memorandum, I set out the well-settled authority governing receivership proceedings. *(Case No. 09-63, Doc. No. 37; Case No. 09-64, Doc. No. 35.)* District

courts have wide discretion to fashion distribution plans to recover investors' lost assets. SEC v. Infinity Group Co., 226 Fed. Appx. 217, 218 (3d Cir. 2007); SEC v. Fischbach, 133 F.3d 170, 175 (2d Cir. 1997).

When claims are brought against Ponzi scheme investors, "the general rule is that to the extent innocent investors have received payments in excess of the amounts of principal that they originally invested, those payments are avoidable as fraudulent transfers." Donell v. Kowell, 533 F.3d 762, 770 (9th Cir. 2008); In re United Energy Corp., 944 F.2d 589, 596 (9th Cir. 1991) (Ponzi scheme winners should not be permitted to "enjoy an advantage over later investors sucked into the Ponzi scheme who were not so lucky.") See also SEC v. Infinity Group Co., 993 F. Supp. 324, 331-32 (E.D. Pa. 1998), *aff'd*, 212 F.3d 180 (3d Cir. 2000) (disgorging innocent third parties' gains in a Ponzi scheme for distribution to defrauded investors).

A receiver's legal entitlement to recover a winning investor's false profits is thus well-settled; her entitlement to recover that investor's principal is less clear. Although the Third Circuit has not addressed the issue, several courts have ordered that winning investors' profits and principal should be divided *pro rata* among all investors. See SEC v. George, 426 F.3d 786, 798-99 (6th Cir. 2005) (ordering winning investors to return profits and principal because "hundreds of other investors were victimized by this scheme, yet they will recover only 42 percent of the money they invested, not the 100 percent to which the relief defendants claim to be entitled"); SEC v. Credit Bancorp, Ltd., 290 F.3d 80, 89 (2d Cir. 2002) ("[T]he use of a pro rata distribution has been deemed especially appropriate for fraud victims of a 'Ponzi scheme,' . . . in which earlier investors' returns are generated by the influx of fresh capital from unwitting newcomers rather than through legitimate investment activity.") Other courts have held that a

receiver has no claim to a net winner's principal because he was an "innocent investor."  See Donell, 533 F.3d at 780l; Scholes v. Lehmann, 56 F.3d 750, 757-58 (7th Cir. 1995).

The Pennsylvania Uniform Fraudulent Transfer Act authorizes a receiver to recover both profit and principal from winning investors in certain circumstances.  12 Pa. C.S.A. § 5101 *et seq*.  For instance, a receiver may, pursuant to the statute's "actual fraud" provision, allege that the Ponzi scheme operator made transfers to the winning investor "with actual intent to hinder, delay or defraud" the losing investors.  12 Pa. C.S.A. § 5103(a).  Significantly, the mere existence of a Ponzi scheme is sufficient to establish "actual intent to defraud."  Donell, 533 F.3d at 770.  The receiver alleging fraud may thus recover the entire amount paid to the winning investor, including principal.  Id.

A winning Ponzi scheme investor may retain his or her principal through the demonstration of "good faith."  12 Pa. C.S.A. § 5108(d).  This affirmative defense requires that the winning investor establish (1) his innocence, and (2) an exchange of fair value (always satisfied in Ponzi scheme cases, because the principal was both invested and returned).  In re Burry, 309 B.R. 130, 135 (Bankr. E.D. Pa. 2004).  Because a "good faith" defense requires the trial fact-finder to determine whether the investor had "sufficient knowledge to place [him] on inquiry notice of the voidability of the transfer," courts typically assess whether the investors ignored "red flags" revealing the true nature of the challenged investment.  Id. at 136.  The law thus seeks to determine whether winning investors ignored indications of fraud so that they could continue to earn "profits."  Donell, 533 F.3d at 770.  If a winning investor should have known this or her investment was "too good to be true," the court will void the return of principal to that

investor. Id. at 770-71. That principal will then be redistributed *pro rata* to all defrauded investors. Id.

**III. Discussion**

At the March 15th hearing, the SEC appropriately described the Receivership Estate as "beleaguered." *(Tr. 9.)* Nearly a year after her appointment, Ms. Hecht has collected only $985,103 on behalf of the defrauded investors who lost almost $35 million. Although the Receiver intends to pursue additional claims, it is by no means clear that these efforts will substantially increase the amount available to Forte's victims. Plainly, the only (as yet, untapped) substantial cache of funds potentially available to the defrauded investors is the $22.2 million returned to the "winning" investors as principal.

My March 30, 2009 Order appointing the Receiver provides that "[t]he goal and purpose of the Receivership is to assume control of, marshal, pursue, and preserve the Receivership Assets with the objective of maximizing the recovery of defrauded investors, and . . . ensuring that the distribution of those assets is as just and equitable as possible." *(No. 09-63, Doc. No. 26 ¶ II; No. 09-64, Doc. No. 24 ¶ II.)* It appears that in attempting to meet this obligation, the Receiver and Mr. Hoyle have considered the "red flags" I discussed earlier, and are prepared to seek return of the winning investors' principal. Mr. Hoyle and the Receiver have refrained from initiating such litigation, however, because of the SEC's opposition.

Although the Commission has not been entirely clear, it apparently has two reasons for this opposition: (1) it has found no individualized evidence of the Raevskys' bad faith; and (2) it is concerned that litigating for the return of principal will be unsuccessful and expensive. I find the SEC's first reason remarkable: the Commission lacks individualized evidence of bad faith

because it opposes instituting litigation by which such evidence might be discovered. I believe that this is what authors of popular literature refer to as a "Catch-22." http://www.merriam-webster.com/dictionary/catch-22.

The Commission has now clarified its position, assuring me that it would "absolutely" allow individualized discovery to go forward "in the context of the Receivership Order." *(Tr. 13.)* This assurance also addresses the Commission's second concern: conducting individualized discovery as part of the existing case – thus avoiding the need to draft multiple complaints and initiate new actions against the winning Forte investors – will greatly reduce legal costs.

In these circumstances, I will not approve the instant proposed Consent Order because, as presented, it does not serve the Receivership Estate's best interests. Mr. Hoyle has set out a multitude of "red flags" that arguably should have placed Forte's investors on inquiry notice as to the true nature of Forte's enterprise. Mr. Hoyle has not, however, had the opportunity to question the Raevskys under oath respecting these "red flags," their relationship with Forte, and other factors that could well indicate exactly what the Raevskys knew about Forte and the Limited Partnership. If, after conducting individualized discovery as allowed by the Federal Rules of Civil Procedure – including the taking of depositions – Mr. Hoyle and the Receiver are satisfied that the Raevskys acted in good faith, they may resubmit the proposed Consent Order. If Mr. Hoyle and the Receiver are not so satisfied, they may take those actions, consistent with my March 30, 2009 Order, that they believe is in the best interests of the Receivership Estate.

## IV. Conclusion

For these reasons, I will disapprove without prejudice the proposed Consent Order settling the Receiver's potential claims against Bernard and Norma Raevsky.

**BY THE COURT.**

*/s/ Paul S. Diamond*

______________________________

**Paul S. Diamond, J.**