**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

------------------------------------------------------ :
**SECURITIES AND EXCHANGE**      :
**COMMISSION,**      :
     :
              **Plaintiff,**      :
     :
              **v.**      :          **CIVIL NO. 09-63**
     :
**JOSEPH S. FORTE and**      :
**JOSEPH FORTE, L.P.,**      :
     :
              **Defendants.**      :
------------------------------------------------------ :
     :
**COMMODITY FUTURES TRADING**      :
**COMMISSION,**      :
     :
              **Plaintiff,**      :
     :
              **v.**      :          **CIVIL NO. 09-64**
     :
**JOSEPH S. FORTE and**      :
**JOSEPH FORTE, L.P.,**      :
     :
              **Defendants.**      :

**Diamond, J.**          **May 16, 2012**

<u>**MEMORANDUM**</u>

The Equity Receiver in this matter has asked me to approve proposals intended to maximize the recovery to innocent Investors defrauded by Joseph Forte's operation of a Ponzi scheme. *(Civ. No. 09-63, Doc. No. 90; Civ. No. 09-64, Doc. No. 75.)* Approximately one-third of Forte's Investors have objected. For the following reasons, I will overrule the objections and grant the Receiver's request.

## I.        BACKGROUND AND PROCEDURAL POSTURE

On January 7, 2009, the Securities and Exchange Commission and Commodity Futures Trading Commission brought civil enforcement actions against Joseph S. Forte and Joseph Forte, L.P. (the Partnership), alleging that Forte was running the Partnership as a Ponzi scheme. *(Civ. No. 09-63, Doc. No. 1; Civ. No. 09-64, Doc. No. 1.)* On September 30, 2009, I approved a Partial Final Judgment that reflected Forte's admissions of liability. *(Civ. No. 09-63, Doc. No. 34.)*

On March 30, 2009, I appointed Marion A. Hecht as Receiver of Defendants' assets. *(Doc. No. 26.)* I charged her and her Counsel, Lawrence T. Hoyle, with "assum[ing] control of, marshal[ing], pursu[ing], and preserv[ing] the Receivership Assets with the objective of maximizing the recovery of defrauded Investors and, to the extent that the assets recovered may be inadequate to make them whole, ensuring that the distribution of those assets is as just and equitable as practicable." *(Id. at 3.)* See Liberte Capital Group, LLC v. Capwill, 462 F.3d 543, 551 (6th Cir. 2006) (describing equity receiver's role (citing 13 James Wm. Moore et al., Moore's Federal Practice ¶¶ 66.02-.03 (3d ed. 1999)).

The Receiver and 94 of Forte's 125 Limited Partners concluded "tolling agreements" by which those Investors waived any limitations defense as to claims that were legally viable as of March 29, 2010—less than one year after Ms. Hecht's appointment. *(Doc. No. 104 at 12.)* The Receiver initiated "clawback" actions against those Investors who did not enter into tolling agreements, thus seeking to recover disbursements determined to be fraudulent. *(Id.)* See, e.g., Hecht v. Malvern Preparatory Sch., 716 F. Supp. 2d 395 (E.D. Pa. 2010).

The Receiver has filed the instant Motion for an Order Setting a Claims Bar Date, Establishing Claims Resolution Procedures, and Approving Distribution Methodology. *(Doc. No. 90.)* After meeting with Investor representatives, she twice revised the Proposed Order. *(Doc.*

*Nos. 97, 107.)* The following Investors have filed objections to the Receiver's proposals: a Group represented by Stradley Ronon Stevens & Young LLP; a Group represented by Drinker Biddle & Reath LLP; and two individual Investors. *(Doc. Nos. 100; 101; 102; 105, Exs. A, B.)* The SEC has filed a Response in support of the proposals. *(Doc. No. 99.)*

## II.     PROPOSED ORDER

The Receiver's Proposed Order (attached as Appendix A) provides that claims against the Estate must be submitted no later than the Claims Bar Date, which shall be published to Investors and potential creditors. After receiving all timely claims, the Receiver will file a Quantitative Claims Report that sets out the amount, validity, and payment priority of each claim. The Receiver will also conduct discovery to determine individual culpability and notice as to fraud. She will then file a Qualitative Claims Report in which she recommends that: 1) named Investors who were culpable participants in Forte's scheme may not receive equitable distributions; 2) Investors who were on "inquiry notice" of the fraud may receive distributions only if they first return the false profits and principal they withdrew while on inquiry notice, or reach a Court-approved agreement with the Receiver as to a distribution; and 3) Investors not on inquiry notice may receive their full equitable distributions.

If an Investor cannot resolve a dispute he or she has with the Receiver regarding a Claim Determination, the matter will be submitted to me for resolution. In deciding these disputes, I will apply the substantive law that would govern analogous ancillary litigation. Discovery will be permitted. See SEC v. Elliott, 953 F.2d 1560, 1567 (11th Cir. 1992) (summary procedures appropriate in receivership proceedings if they "permit parties to present evidence when the facts are in dispute and to make arguments regarding those facts").

3

At any time before I resolve a dispute, the Receiver may initiate ancillary litigation against the Investor, including a clawback action. This would operate as a stay of the dispute resolution proceeding before me. Once I resolve all disputes that are not stayed by ancillary litigation, the Receiver will submit to me a Final Claim Determination Report. If I approve the Report, the Receiver will distribute funds to Investors and other creditors, keeping only monies needed for the Receivership's continuing litigation, wind-up procedures, and the like. Half the Distribution Assets will be distributed using "Net Investment" methodology, and half using "Rising Tide" methodology.

## III.   DISCUSSION

### A.   Fairness

The Stradley Objectors contend that the proposed distribution "would produce an unprecedented, inequitable and arbitrary" redistribution of Receivership Assets. In their view, the Receiver's approach "punish[es] innocent investors" by preventing an Investor from obtaining an equitable distribution unless he first returns any false profits or principal he withdrew while on "inquiry notice." *(App. A ¶ 10(e)(ii).)* I do not agree.

Applying the Bankruptcy Code, the Third Circuit has defined "inquiry notice" as follows:

> If a transferee possesses knowledge of facts that suggest a transfer may be fraudulent, and further inquiry by the transferee would reveal facts sufficient to alert him that the property is recoverable, he cannot sit on his heels, thereby preventing a finding that he has knowledge.

In re Bressman, 327 F.3d 229, 236 (3d Cir. 2003) (quoting In re Sherman, 67 F.3d 1348, 1357 (8th Cir. 1995)); see also Alaska Elec. Pension Fund v. Pharmacia Corp., 554 F.3d 342, 347 (3d Cir. 2009) ("The inquiry notice determination requires a 'totally objective' analysis that pinpoints the time at which 'a reasonable investor of ordinary intelligence would have discovered the information [demonstrating possible liability] and recognized it as a storm

4

warning.'" (quoting <u>Mathews v. Kidder, Peabody & Co., Inc.</u>, 260 F.3d 239, 252 (3d Cir. 2001))).

Permitting "inquiry notice" Investors both to keep the funds they withdrew and to obtain equitable distributions would be unfair to those Investors who had no reason to suspect fraud, and so presumably withdrew little or no money before the Partnership collapsed. <u>See</u> <u>Marion v. TDI Inc.</u>, 591 F.3d 137, 148 (3d Cir. 2010) (principal goal of receivership is fair distribution of assets (citing <u>Wuliger v. Mfrs. Life Ins. Co.</u>, 567 F.3d 787, 795 (6th Cir. 2009))); <u>SEC v. Wealth Mgmt. LLC</u>, 628 F.3d 323, 332-33 (7th Cir. 2010) (same). I will not reward Investors with equitable shares if they choose to keep principal they withdrew after they had good reason to believe that Forte's "investment" regime was dishonest. *(App. A ¶ 10(e)(ii).)* <u>See</u> <u>SEC v. Infinity Group Co.</u>, 226 F. App'x 217, 218 (3d Cir. 2007) ("District Courts have wide equitable discretion in fashioning distribution plans in receivership proceedings[.]" (citing <u>SEC v. Black</u>, 163 F.3d 188, 199 (3d Cir. 1998))); <u>see also</u> <u>SEC v. Vescor Capital Corp.</u>, 599 F.3d 1189, 1194 (10th Cir. 2010) (district court has "inherent powers of an equity court to fashion relief"); <u>SEC v. Enter. Trust Co.</u>, 559 F.3d 649, 652 (7th Cir. 2009) ("District judges possess discretion to classify claims sensibly in receivership proceedings."); <u>SEC v. Basic Energy & Affiliated Res., Inc.</u>, 273 F.3d 657, 668 (6th Cir. 2001); <u>Elliott</u>, 953 F.2d at 1566.

The Stradley Objectors also argue that "reckless" participants in the Ponzi scheme should be allowed to receive equitable distributions. Again, I disagree. The Proposed Order provides:

> [I]f the Receiver determines that an investor was a culpable participant in Joseph S. Forte's Ponzi scheme . . . [by] recklessly taking actions that furthered the Ponzi scheme . . . the Receiver shall recommend no distribution to that investor[.]

*(App. A ¶ 10(e)(i).)* A person acts "recklessly" if he or she "realizes or, from the facts which he [or she] knows, should realize that there is a strong probability that harm may result[.]"

Archibald v. Kemble, 971 A.2d 513, 517 (Pa. Super. Ct. 2009) (quoting Restatement (Second) of Torts § 500 cmt. f (1965)).

Remarkably, the Stradley Objectors believe that Investors who acted recklessly are innocent. ("This approach would punish innocent investors that did not knowingly and intentionally participate in the fraud[.]") *(Doc. No. 100 at 23.)* It is difficult to accept that such a contention is made seriously. Those Investors who, by their reckless behavior, furthered Forte's Ponzi scheme plainly are not "innocent" and so are not entitled to the same relief as truly innocent Investors. See Enter. Trust Co., 559 F.3d at 652; SEC v. Byers, 637 F. Supp. 2d 166, 184 (S.D.N.Y. 2009) ("The Receiver's proposal to treat differently those involved in the fraudulent scheme when distributions are being made is eminently reasonable and is supported by caselaw." (citing Basic Energy, 273 F.3d at 660)).

The Stradley Objectors further argue that distributing half the Receivership Assets using the "Net Investment" methodology, and the other half using the "Rising Tide" methodology, is unfair, unnecessarily complex, and unprecedented.

Courts regularly employ these methodologies in distributing receivership assets. See, e.g., CFTC v. Lake Shore Asset Mgmt. Ltd., No. 07-3598, 2010 WL 960362, at *7-*9 (N.D. Ill. Mar. 15, 2010); SEC v. AmeriFirst Funding, Inc., No. 07-1188, 2008 WL 919546, at *6 (N.D. Tex. Mar. 13, 2008). Under the "Net Investment" methodology, an Investor's distribution is equal to the amount the Investor lost multiplied by the ratio of the total amount distributed to all Investors to the total amount lost by all Investors. *(Doc. No. 90 at 35.)* Under the "Rising Tide" methodology, assets are distributed to those Investors who lost the greatest percentage of their investment until their losses match those of other Investors who lost a smaller percentage. *(Id. at 35-36.)* "In general, the Net Investment methodology favors those investors with the greatest

6

losses in absolute dollars; the Rising Tide methodology favors those investors who lost the greatest percentage of their investments." (*Id.* at 36.)

Because "more than half of the losses in absolute dollars were incurred by a handful of investors, while about half the losing investors lost over half of their investment," employing both methodologies is fairest. (*Id.* at 43-45.) Moreover, this hybrid approach is neither complex nor burdensome: the Receiver has already prepared spreadsheets by which she will determine individual distributions instantly with no additional cost. (*Doc. No. 104 at 51.*) Finally, because the actions of court-appointed receivers are not invariably reported or readily accessible, I cannot determine whether this hybrid approach is "unprecedented." Even if it is, that does not speak to its suitability here. Every receivership is as different as the manner by which investors are defrauded. Remedies appropriate for some estates may be unsuitable for others. Here, where over half the fraud loss was suffered by a small group of Investors, and half the losing Investors lost more than fifty percent of their investment, combining equally the Net Investment methodology (which will favor the first group) and the Rising Tide methodology (which will favor the second), whether "precedented" or not, is appropriate.

    B.    <u>Efficiency</u>

The Objectors next argue that individualized discovery and clawback actions will waste Estate funds. I am satisfied that the proposed procedures will benefit the Receivership. Pursuant to SEC guidelines, the Receiver must certify that any action she takes is likely to produce a net economic benefit. (*Doc. No. 87, Exs. B, C.*) This is consistent with the Receiver's intention to take discovery as to an Investor's state of mind only "[t]o the extent warranted by the size of an investor's claim[.]" (*App. A ¶ 10(d).*) Moreover, the Receiver has already taken discovery to identify those Investors from whom she will seek to recover principal. Finally, the Receiver and

the SEC agree that my resolution of the key legal issues in dispute—standing, the lookback period, and the definition of "good faith"—will reduce litigation costs. *(Doc. No. 99 at 1-2.)*

The Objectors have also attacked as inefficient the requirement that "inquiry notice" Investors return false profits and principal before they may receive equitable distributions. I do not believe, however, that the requirement—which, as I have explained, is essential to promoting fairness—will encumber the equitable distribution of Estate Assets. On the contrary, the requirement will likely promote settlement and so advance the "orderly and efficient administration" of the Estate, and preserve Receivership Assets. *(App. A ¶ 10(e)(ii).)* Marion, 591 F.3d at 148 (quoting SEC v. Hardy, 803 F.2d 1034, 1038 (9th Cir. 1986)); see United States v. Acorn Tech. Fund, L.P., 429 F.3d 438, 443 (3d Cir. 2005) (court has interest in preventing drain on receivership assets); SEC v. Universal Fin., 760 F.2d 1034, 1038 (9th Cir. 1985) (court has interest in promoting judicial economy).

   C.    Pennsylvania Uniform Fraudulent Transfer Act

The Pennsylvania Uniform Fraudulent Transfer Act "protect[s] a debtor's unsecured creditors from unfair reductions in the debtor's estate" by allowing a claimant to avoid or annul a fraudulent transfer or obligation. 18A Summ. Pa. Jur. 2d Commercial Law § 22:1; see 12 Pa. Cons. Stat. §§ 5104, 5107; In re Blatstein, 260 B.R. 698, 707 (E.D. Pa. 2001). In a fraudulent transfer or clawback action, a transferee may raise the affirmative defense that he or she accepted the transfer in "good faith." 12 Pa. Cons. Stat. § 5108; Malvern, 716 F. Supp. 2d at 401.

The Stradley and Drinker Objectors argue that the Proposed Order violates PUFTA. *(Doc. Nos. 100 at 5; 102 at 10.)*

*Return of Principal*

According to the Objectors, the Qualitative Claims Determination process "rejects the good faith defense of investors who were merely on inquiry notice by requiring them to return principal." *(Doc. No. 102 at 10.)* This is simply incorrect. The Proposed Order provides:

> [I]f the Receiver determines that an investor was on inquiry notice with respect to the illicit operation of the Partnership, the Receiver shall recommend that the investor share equitably in distributions only if (1) the false profits and principal withdrawn during the period after the investor was on inquiry notice are returned to the Receivership Estate or (2) the Receiver and the investor reach an agreement that is approved by the Court concerning a recommended claim amount that takes into account the investor's level of inquiry notice[.]

*(App. A ¶ 10(e)(ii).)* This does not require an "inquiry notice" Investor to return anything. Rather, if the Investor *chooses* not to return assets to the Estate, he or she may not receive an equitable distribution.

The Objectors believe that under PUFTA, an Investor who takes Partnership assets in "good faith" is legally entitled to an equitable distribution. Again, this is incorrect. Under PUFTA, a successful "good faith" defense permits an Investor to keep principal he or she withdrew from the Partnership. See 12 Pa. Cons. Stat. § 5108(a). PUFTA does not control whether an Investor should share in the distribution of Receivership Assets; this is an equitable determination created outside the PUFTA framework. See Infinity Group, 226 F. App'x at 218. As I have explained, the equities disfavor Investors who knew or should have known they were withdrawing funds from a Ponzi scheme. By withholding equitable distributions from such Investors unless they first return false profits and principal, the Receiver puts these Investors in the same monetary position as truly innocent Limited Partners. See id.; cf. Cunningham v. Brown, 265 U.S. 1, 13 (1924) ("equality is equity").

In sum, the Receiver's inquiry notice proposal does not violate PUFTA.

9

*Good Faith*

In anticipation of new clawback litigation, the Parties have asked me to provide a standard for PUFTA's "good faith" defense. Although they agree that this question is ripe for decision, ripeness is not apparent. See <u>Suburban Trails, Inc. v. N.J. Transit Corp.</u>, 800 F.2d 361, 365 (3d Cir. 1986). Accordingly, I must examine "(1) 'the fitness of the issues for judicial decision,' and (2) 'the hardship of the parties of withholding court consideration.'" <u>Surrick v. Killion</u>, 449 F.3d 520, 527 (3d Cir. 2006) (quoting <u>Khodara Envtl., Inc. v. Blakey</u>, 376 F.3d 187, 196 (3d Cir. 2004)).

The proper standard for PUFTA's "good faith" defense is a purely legal question that requires no further factual development. See <u>Khodara</u>, 376 F.3d at 197-98. The Objectors and the Receiver have fully briefed the issues; delaying adjudication until the question arises in ancillary litigation will not allow fuller consideration. Indeed, setting out a standard now will enable the Parties better to evaluate the merits of their cases, thus perhaps avoiding unnecessary litigation. See <u>Marion</u>, 591 F.3d at 148 (goal of equity receivership is "orderly and efficient administration of the estate . . . for the benefit of creditors"); <u>Acorn Tech. Fund</u>, 429 F.3d at 443 (court has interest in preventing drain on receivership assets). Accordingly, I conclude the question is ripe for decision.

Under PUFTA, "good faith" is subjective; a transferee can make out good faith only if he or she acted without "*actual* fraudulent intent" and did not "actively participate in" the debtor's fraudulent scheme. 12 Pa. Cons. Stat. § 5108 cmt. 6 (emphasis added). Accordingly, "[t]he transferee's or obligee's knowledge of the transferor's insolvency may . . . in combination with the transferee's or obligee's knowledge concerning other facts, be relied upon as evidencing a lack of 'good faith' on the part of the transferee or obligee." <u>Id.</u>

Under abundant authority, an Investor may evince "actual fraudulent intent" by willful or reckless blindness—i.e., by willfully or recklessly ignoring red flags that suggest a fraudulent scheme without investigating or taking other appropriate action. See Harrell v. Beall, 84 U.S. 590, 591 (1873); CFTC v. Equity Fin. Group LLC, 572 F.3d 150, 159 (3d Cir. 2009) (recklessness can make out "intent to deceive, manipulate, or defraud"); SEC v. Infinity Group Co., 212 F.3d 180, 192 (3d Cir. 2000) (same); In re Nieves, 648 F.3d 232, 239 (4th Cir. 2011) ("transferees do not take in good faith if they remain 'wil[l]ful[ly] ignoran[t] in the face of facts which cr[y] out for investigation.'" (quoting In re Harbour, 845 F.2d 1254, 1258 (4th Cir. 1988))); Stamat v. Neary, 635 F.3d 974, 982 (7th Cir. 2011) ("sufficiently" reckless disregard for truth can make out fraudulent intent under Bankruptcy Code); In re Bren, 122 F. App'x 285, 288 (8th Cir. 2005) ("obstinate" desire to remain ignorant of financial details is sufficiently reckless to make out fraudulent intent); HBE Leasing Corp. v. Frank, 48 F.3d 623, 637 (2d Cir. 1995) ("[The transferee's] failure to inquire represented a conscious turning away from the subject."); First Commodity Corp. of Boston v. CFTC, 676 F.2d 1, 6-7 (1st Cir. 1982) (fraudulent intent shown by recklessness "that departs so far from the standards of ordinary care that it is very difficult to believe the speaker was not aware of what he was doing"); Stephenson v. PricewaterhouseCoopers, LLP, 768 F. Supp. 2d 562, 574-75 (S.D.N.Y. 2011) (allegations of accounting violations and reckless ignorance of red flags sufficient to plead "fraudulent intent"); In re Manhattan Inv. Fund Ltd., 397 B.R. 1, 25 n.39 (S.D.N.Y. 2007) (if transferee is on inquiry notice, "taking no steps at all" amounts to "willful ignorance" that defeats good faith defense); Cybermedia, Inc. v. Symantec Corp., 19 F. Supp. 2d 1070, 1075 (N.D. Cal. 1998) (under California law on which PUFTA is modeled, transferee lacks good faith if he "has actual knowledge of facts which would suggest to a reasonable person that the transfer was

11

fraudulent"); <u>Chorost v. Grand Rapids Factory Showrooms</u>, 77 F. Supp. 276, 281 (D.N.J. 1948) ("If this defendant did not know of the fraud . . . it was only because he willfully ignored the many facts which pointed to the fraudulent scheme[.]"); <u>Davis v. Pa. Co. for Ins. on Lives & Granting Annuities</u>, 12 A.2d 66, 69 (Pa. 1940) (failure to inquire due to "deliberate desire to evade knowledge" constitutes bad faith); <u>cf.</u> <u>In re Merck Co., Inc. Sec., Derivative & "ERISA" Litig.</u>, 543 F.3d 150, 161 (3d Cir. 2008) (plaintiff aware of storm warnings has duty to investigate); <u>Rock v. Warhank</u>, 757 N.W.2d 670, 675-76 (Iowa 2008) ("reasonable diligence" requirement exists "to prevent a plaintiff from benefiting from willful or reckless ignorance").

An Investor may thus show he took in good faith under § 5108(a) if, when the Investor accepted Partnership funds, he could not reasonably have been expected to suspect Partnership wrongdoing. <u>See</u> <u>China Res. Prods. (U.S.A.) Ltd. v. Fayda Int'l, Inc.</u>, 856 F. Supp. 856, 863 (D. Del. 1994) (fraudulent intent usually shown with circumstantial evidence); <u>Chorost</u>, 77 F. Supp. at 281 (same). Relevant circumstances include the Investor's financial sophistication, the number and nature of the red flags that confronted the Investor, and whether the monies the Investor obtained from the Partnership likely deterred him from investigating or taking other appropriate action.

Because subjective intent is critical, the Investor may show under PUFTA that he or she acted in good faith by engaging in a "diligent" investigation, even if the investigation failed to uncover fraud. <u>See</u> <u>Gredd v. Bear, Stearns Secs. Corp.</u>, 328 F. App'x 709, 710 (2d Cir. 2009) (upholding jury finding that Bear Stearns' unsuccessful investigation of red flags established good faith); <u>Lewis v. Superior Court</u>, 37 Cal. Rptr. 2d 63, 70 (Cal. Ct. App. 1994). The transferee must make out diligence. Critical to this showing is whether the transferee's inquiry

"ameliorated" the issues that caused him or her to investigate. See Ameriserv, 2009 WL 890583, at *6 n.19 (citing In re Bayou Group, LLC, 396 B.R. 810, 846 (Bankr. S.D.N.Y. 2008)).

The Stradley Objectors cite authority suggesting that a transferee who ignored storm warnings of wrongdoing, and who failed to investigate, may nonetheless show he acted in good faith if a diligent investigation would not have uncovered the fraudulent scheme. See Bressman, 327 F.3d at 236-37 (citing Sherman, 67 F.3d at 1357); see also In re Bayou Group, LLC, 439 B.R. 284, 312-13 (S.D.N.Y. 2010). I do not agree. Once again, the gravamen of PUFTA's good faith inquiry is the transferee's state of mind. 12 Pa. Cons. Stat. § 5108 cmt. 6. Whether an investigation would have revealed Forte's fraud is an *ex post* determination that is not probative of whether an Investor had actual fraudulent intent at the time of a suspect transfer. See HBE Leasing, 48 F.3d at 637; Manhattan Inv. Fund, 397 B.R. at 25 n.39. In any event, the authority the Objectors offer is inapposite. The Bressman Court addressed the Bankruptcy Code provision that a trustee may not recover a fraudulent transfer if the transferee took, *inter alia*, "without knowledge of the voidability of the transfer[.]" 11 U.S.C. § 550(b)(1). This provision was expressly excluded from PUFTA. 12 Pa. Cons. Stat. § 5108 cmt. 6.

*Permissible Preferences*

The Stradley Objectors argue the Receiver improperly treats permissible preferences as fraudulent transfers. See 12 Pa. Cons. Stat. § 5104(a); Peoples-Pittsburgh Trust Co. v. Holy Family Polish Nat. Catholic Church, 19 A.2d 360, 361 (Pa. 1941). This argument is also without any legal support. Forte has admitted that he ran a Ponzi scheme. *(Doc. No. 34-1.)* Accordingly, as I have ruled, any transfer of Partnership assets made at Forte's direction is presumptively fraudulent. See, e.g., Malvern, 716 F. Supp. 2d at 400-01 (citing Donell v. Kowell, 533 F.3d 762,

770 (9th Cir. 2008)); In re Bernard L. Madoff Inv. Secs. LLC, 458 B.R. 87, 104-05 (Bankr.

S.D.N.Y. 2011); In re C.F. Foods, L.P., 280 B.R. 103, 110 (Bankr. E.D. Pa. 2002).

     D.    Standing

     The Stradley Objectors argue the Receiver has no standing to institute clawback actions

as provided in the Proposed Order. *(Doc. No. 100 at 15; App. A ¶ 11(g).)* I have already ruled,

however, that the Receiver has standing to bring PUFTA claims. See Malvern, 716 F. Supp. 2d

at 402. Moreover, ample authority establishes that a receiver has standing to assert fraudulent

transfer claims as to estate assets. See Donell, 533 F.3d at 777; Scholes v. Lehman, 56 F.3d 750,

754 (7th Cir. 1995); Miller v. Harding, 248 F.3d 1127 (1st Cir. 2000) (dicta); Armstrong v.

Collins, No. 01-2437, 2010 WL 1141158, at *33 (S.D.N.Y. Mar. 24, 2010); Hodgson v. Kottke

Assocs., LLC, No. 06-5040, 2007 WL 2234525, at *7 (E.D. Pa. Aug. 1, 2007) (citing In re Pers.

& Bus. Ins. Agency, 334 F.3d 239, 246 (3d Cir. 2003)); cf. Marion, 591 F.3d at 149 (citing

Donell and Scholes with approval); In re IFS Financial Corp., 669 F.3d 255, 261 (5th Cir. 2012)

(bankruptcy trustee has standing to bring fraudulent transfer claim under Texas UFTA). The

receivers in the cases offered by the Stradley Objectors were not appointed to preserve assets for

the adversely dominated entity (here, the Partnership). Eberhard v. Marcu, 530 F.3d 122, 133 (2d

Cir. 2008); Troelstrup v. Index Futures Group, Inc., 130 F.3d 1274 (7th Cir. 1997).

     E.    Lookback Period

     Finally, the Stradley Objectors argue that the Receiver may not recover principal that was

withdrawn four years or more before she initiates a clawback action to avoid the transfer. *(Doc.*

*No. 100 at 18.)* Once again, I have already ruled on this question.

     Clawback actions under § 5104(a)(1) may be brought until the later of: 1) four years from

the date of the transfer; or 2) one year from the date the "transfer or obligation was or could

14

reasonably have been discovered by the claimant." 12 Pa. Cons. Stat. § 5109(1). The Stradley Objectors contend that under the second prong, I should look to the date the transfer—not its fraudulent nature—could have been discovered. This is absurd. The majority rule provides just the opposite. See State Farm Mut. Auto. Ins. Co. v. Cordua, No. 07-518, 2011 WL 6009970, at *5 (E.D. Pa. Dec. 2, 2011) (collecting cases). Moreover, the discovery period begins when *the claimant* reasonably could have discovered the transfer. 12 Pa. Cons. Stat. § 5109(1). As I have explained, Ms. Hecht was not a claimant and had no reason or authority to investigate Forte's transfers until I appointed her on March 30, 2009. Malvern, 716 F. Supp. 2d at 400; see also Resolution Trust Corp. v. Farmer, 865 F. Supp. 1143, 1151-52 & n.7, 1157-58 (E.D. Pa. 1994) (Rendell, J.) (predicting Pennsylvania Supreme Court would accept adverse domination doctrine); In re Reading Broad., Inc., 390 B.R. 532, 553 (Bankr. E.D. Pa. 2008) (same). As I described above, all fraudulent transfer claims the Receiver might yet bring are covered by tolling agreements. Because these claims could not have been time-barred as of the tolling agreement date of March 29, 2010—less than a year after the Receiver's appointment—Ms. Hecht may bring those claims without exceeding § 5104's one-year "lookback" period.

## IV.   CONCLUSION

The issues the Objectors have raised are not close; indeed, I rejected a number of the same contentions months ago. Malvern, 716 F. Supp. 2d at 400, 402. It is perhaps ironic that, having compelled the Estate to respond at length to these baseless arguments, the Objectors complain that the Receiver's professional fees are too high. These complaints are of a piece with the heated, often unreasoning, resistance with which the Receiver and her Counsel have been met since their appointment. See Hecht v. Malvern Preparatory Sch., No. 10-1374, 2010 WL 3398957 (E.D. Pa. Aug. 26, 2010) (dismissing counterclaim that the Receiver owed the school

15

Forte's pledged charitable donations when the donations were to be made with stolen funds). I am acutely aware of the professional costs incurred by the Receiver. That the great majority of Forte's Investors have not objected to the Receiver's proposals confirms my conclusion that the proposals will likely benefit the Estate. Accordingly, I will grant the Receiver's Motion.

An appropriate Order follows.

*/s/ Paul S. Diamond*

**Paul S. Diamond, J.**

**APPENDIX A**

**PROPOSED ORDER**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

```
------------------------------------------------------ :
SECURITIES AND EXCHANGE                                 :
COMMISSION,                                             :
                                                        :
                            Plaintiff,                  :
                                                        :
            v.                                          :   CIVIL ACTION NO. 09-CV-0063-PD
                                                        :
JOSEPH S. FORTE and                                     :
JOSEPH FORTE, L.P.,                                     :
                                                        :
                            Defendants.                 :
------------------------------------------------------ :
                                                        :
COMMODITY FUTURES TRADING                               :
COMMISSION,                                             :
                                                        :
                            Plaintiff,                  :
                                                        :
            v.                                          :   CIVIL ACTION NO. 09-CV-0064-PD
                                                        :
JOSEPH S. FORTE,                                        :
                                                        :
                            Defendant.                  :
------------------------------------------------------ :
```

**[PROPOSED] ORDER SETTING A CLAIMS BAR DATE, ESTABLISHING CLAIMS**
**RESOLUTION PROCEDURES, AND APPROVING**
**DISTRIBUTION METHODOLOGY**

AND NOW, this _____ day of _____, 2011, upon consideration of the

Receiver's Motion for an Order Setting a Claims Bar Date, Establishing Claims Resolution

Procedures, and Approving a Distribution Methodology, it is hereby ORDERED that

The Receiver's Motion is GRANTED, and the Court further orders that:

18

## Claims Bar Date

(1)     The Receiver shall give notice of the Claims Bar Date, using the Notice of Claims

Bar Date and Procedure for Filing Claims and Claim Forms attached as Exhibits A, B, and C to

the Motion, according to the procedures set forth in Section XI of the March 30, 2009, Order

appointing Marion A. Hecht as Receiver for Defendants.  Such notice shall include publication

on the Receivership website, provision of the Notice via e-mail to the SEC and CFTC, and

provision of notice by first class mail to any person or entity whom the Receiver reasonably

believes may have a claim against Joseph S. Forte or Joseph Forte L.P., including all the

Partnership's investors.

(2)     The Receiver shall also publish notice in the form attached as Exhibit D, in the

Philadelphia Inquirer and the Legal Intelligencer once per week, during two successive weeks,

no less than 30 days before the Bar Date.

(3)     The last day for submitting a claim against the Receivership Estate shall be

_____ [a date approximately 60 days after the entry of the Order].

**FAILURE TO SUBMIT A *TIMELY* CLAIM WILL RESULT IN THAT CLAIM BEING**

**BARRED.**

(4)     All claims against the Receivership Estate shall be submitted to the Receiver at

the following address by receipted first class mail or other receipted method of delivery:

> Marion A. Hecht, Receiver for Joseph S. Forte and Joseph Forte, L.P
> c/o Clifton Gunderson LLP
> 4250 North Fairfax Drive, Suite 1020
> Arlington, VA 22203

All claims must be postmarked or otherwise received by the Receiver on or before

_____, 2011 **[the same date set forth in paragraph 3]**.  The burden shall be on

the claimant to demonstrate timely submission.  Administrative claims against the Receivership Estate are specifically excluded from the requirements of this Order.

(5)     All claims against the Receivership Estate by the Partnership's investors shall be filed in writing using the Claim Form attached to the Motion as Exhibit B.

(6)     All claims against the Receivership Estate by claimants other than Partnership's investors shall be filed in writing using the Claim Form attached to the Motion as Exhibit C.

(7)     Submission of a claim in no way obligates the Receiver to recommend the allowance of the claim.  Among other things, it has not yet been determined whether non-investor claimants will be included in any distribution from the Partnership Estate and, if so, how such distributions shall be calculated.

## Service By First Class Mail

(8)     Wherever the Receiver is required to serve claimants or other interested parties by first class mail pursuant to this Order, service shall be made on the party's counsel, or, if unrepresented, at the party's last known address.

## Confidentiality

(9)     In all public filings provided for in this Order, the Receiver shall maintain investor confidentiality by identifying investors by investor number only, but may file a copy that includes investor names under seal with the Court.

## Claims Evaluation Process

(10)     In implementing this Order and evaluating claims, the Receiver shall undertake the following steps.

## Quantitative Claim Determination

(a)     On or before _____ [a date approximately 30 days after the Claims Bar Date], the Receiver shall file a Preliminary Quantitative Claims Report listing the full amount of each timely filed Claim (whether filed by an investor in the Partnership or by another alleged creditor of the Partnership or Joseph S. Forte) together with her assessment of its validity and legal payment priority (for instance, whether the claim is properly made against the Receivership Estate; or whether the debt is secured or unsecured, or has priority for any other reason).  This assessment shall not include the equitable and investor state-of-mind considerations to be assessed in the Qualitative Claims Determination pursuant to paragraphs 10(d) through (f) below.  The Receiver shall serve this Preliminary Quantitative Claims Report on all interested parties by posting it on the Receiver's website, and in addition shall serve each claimant by first class mail.

(b)     Within 30 days of receipt of the Preliminary Quantitative Claims Report, any claimant who disputes the Receiver's determinations regarding the extent, validity, or priority of his or her claim shall notify the Receiver of the dispute.  The dispute notice must be postmarked or otherwise received by the Receiver within 30 days of the date that the Preliminary Quantitative Claims Report was placed into first-class mail by the Receiver.  The burden shall be on the claimant to demonstrate timely submission.

(c)     If the disputing claimant and the Receiver cannot reach a resolution of the dispute after a good faith effort to do so, and the issue is not already before the Court in the context of ancillary litigation, the disputed claims shall be submitted to the Court for resolution in accordance with paragraph (11), below.

**<u>Qualitative Claim Determination for Investor Claimants</u>**

(d)     To the extent warranted by the size of an investor's claim, the Receiver shall conduct such discovery as is, in the Receiver's estimation, reasonable to determine each investor's state of mind regarding the fraud (the "Qualitative Claim Determination").

(e)     In evaluating each claim for the purposes of formulating recommendations concerning distributions, the Receiver shall take into account the level of notice of the fraud attributable to each investor that has been developed in the discovery process.  Specifically:

> (i)     if the Receiver determines that an investor was a culpable participant in Joseph S. Forte's Ponzi scheme either by knowingly or recklessly taking actions that furthered the Ponzi scheme or by willfully closing his or her eyes to the fraud, the Receiver shall recommend no distribution to that investor;

> (ii)    if the Receiver determines that an investor was on inquiry notice with respect to the illicit operation of the Partnership, the Receiver shall recommend that the investor share equitably in distributions only if (1) the false profits and principal withdrawn during the period after the investor was on inquiry notice are returned to the Receivership Estate or (2) the Receiver and the investor reach an agreement that is approved by the Court concerning a recommended claim amount that takes into account the investor's level of inquiry notice; and

> (iii)   if the Receiver determines that an investor was not on inquiry notice with respect to the illicit operation of the Partnership, such investor shall be allowed his or her full share as calculated under Paragraph (15) of this Order.

**<u>Qualitative Claims Determination for Non-Investor Claimants</u>**

(f)     With respect to non-investor claimants, the Receiver may exercise discretion whether or not to conduct discovery regarding state-of-mind or other equitable issues, and, irrespective of whether claimant-specific discovery is taken, may recommend adjustment or non-payment of a non-investor's Quantitative claim on equitable or any other applicable grounds.

**Qualitative Claim Reports**

(g)     Upon completion of all necessary discovery related to the Qualitative Claim Determination for each claimant, the Receiver shall send a Qualitative Claim Report to that claimant by first-class mail.  For investor claimants, the Receiver shall set forth the notice category to which the Receiver has assigned them.  For investors whose recommended claim amount is reduced due to the Receiver's determinations regarding their level of notice, the Receiver shall describe in detail the factual grounds for her determination and provide all documents related to the Qualitative or Quantitative Claim Determinations, including any documents supporting or refuting those Determinations.  For non-investor claimants whose claim has been adjusted under paragraph (10)(f), the Receiver shall explain the reason for the adjustment.  For all claimants, the Receiver shall set forth the resulting claim calculation ("Adjusted Claim Amount").

(h)     Each claimant shall have 30 days from service to notify the Receiver of any objection to the Receiver's proposed Qualitative Adjustments to his or her claim and the grounds, factual or otherwise, for such objection.  The claimant's notice of objection must be postmarked or otherwise received by the Receiver within 30 days after the date that the Receiver's Qualitative Claim Report was mailed.  The burden shall be on the claimant to demonstrate timely submission.

(i)     If the claimant disputes either the Receiver's Qualitative Claim Determination or the Adjusted Claim Amount set forth in the Receiver's Qualitative Claim Report, and the parties cannot, after a good faith attempt, reach a resolution and the issues in dispute are not before the Court in the context of ancillary litigation, the dispute shall be submitted to the Court for resolution in accordance with paragraph (11), below.

**Claim Dispute Motions**

(11)    Any disputes over Quantitative Claim Determinations, Qualitative Claim Determinations, or Adjusted Claim Amounts that cannot be resolved by the parties after a good faith attempt, and which are not the subject of ancillary litigation, shall be submitted in motion form by the Receiver to the Court for adjudication (the "Claim Dispute Motions").  Subject to the following procedures and further order of the Court, the motion shall be adjudicated in accordance with the Federal Rules of Civil Procedure and applicable Local Rules governing Motion practice.

(a)    The Receiver shall serve each Claim Dispute Motion by first class mail upon each claimant with disputed claims that are the subject of the motion.  All other interested parties shall be served by the posting of the Claim Dispute Motions on the Receiver's website. The Claim Dispute Motion shall state with particularity the grounds for the relief requested as required by Federal Rules of Civil Procedure 7(b).  A Claim Dispute Motion shall not include any claim by the Receiver for clawback or any other affirmative recovery against a claimant but shall instead seek only the resolution of the dispute between the Receiver and the claimant regarding the Quantitative Claim Determination, the Qualitative Claim Determination, or the Adjusted Claim Amount.

(b)    During the sixty (60) day period following service of the Claim Dispute Motion, the Receiver and the claimant with disputed claims that are the subject of the Claim Dispute Motion may engage in discovery on matters relevant to the resolution of the motion. Discovery shall be conducted in accordance with the Federal Rules of Civil Procedure, provided,

however, that all responses to discovery requests served pursuant to Rules 33 and 34 shall be due within twenty (20) days of service.

(c)     Each claimant with disputed claims that are the subject of a Claim Dispute Motion shall respond to the motion within twenty-one (21) days after the deadline for completion of discovery concerning the Claim Dispute Motion.

(d)     The Receiver may file a reply brief in support of the Claim Dispute Motion within twenty-one (21) days after the filing of the claimant's response to the Claim Dispute Motion.

(e)     If either the Receiver or the claimant with disputed claims that are the subject of the Claim Dispute Motion contends that disputed issues of material fact preclude the resolution of the Motion on the basis of the papers submitted by the parties, the Court will schedule an evidentiary hearing so that the Court may resolve such disputed factual issues.  A transcript will be made of this hearing.

(f)     In resolving the Claim Dispute Motions, the Court will set forth its reasons for granting or denying the Claim Dispute Motion and will apply the same substantive law as would govern analogous ancillary litigation, including the law governing the allocation of burdens of proof.

(g)     At any point prior to the Court's resolution of a Claim Dispute Motion, the Receiver may elect to commence ancillary litigation against a claimant who is subject to the Claim Dispute Motion, in which ancillary litigation the Receiver may seek, among other things, affirmative recovery in the form of clawback of payments received by the claimant from Joseph

Forte, L.P (the "Partnership") at any point during the life of the Partnership.  The Receiver's commencement of ancillary litigation against the claimant shall serve to stay proceedings relating to the adjudication of the Claim Dispute Motion with respect to that claimant and, upon entry of final judgment in the ancillary litigation, the Court shall resolve the Claim Dispute Motion as to the claimant consistent with such final judgment in the ancillary litigation.  Once the Court has resolved a Claim Dispute Motion as to a claimant, the Receiver shall be barred from commencing any clawback or other ancillary litigation against that claimant and shall be also be barred from otherwise seeking any affirmative recovery from that claimant.  The Receiver's use of any judgment entered in connection with a Claim Dispute Motion shall be limited to its use for offset purposes in connection with the Receiver's final claim determination and distributions.

### Final Claim Distribution Report

(12)     The Receiver shall inform the Court when all disputes have been submitted to the Court by motion and post notice of the same on the Receiver's website.  Upon the Court's resolution of all Claim Dispute Motions that are not stayed as a result of the pendency of ancillary litigation, the Receiver shall file a Final Claim Determination Report, setting forth the final claim determinations, including all Qualitative adjustments, for approval by the Court.  The Receiver shall serve the Final Claim Determination Report upon all claimants by first class mail and on any other interested parties by posting it on the Receiver's website.  All objections to the Final Claim Determination Report shall be filed within 30 days after the date that the Report was placed into first-class mail by the Receiver.  The only permissible grounds for objection shall be that the Final Claim Determination Report does not comport with the Court's resolution of a

Claim Dispute Motion or with an agreement previously reached with the Receiver.  The Final

Claim Determination Report shall list any claims that are the subject of ancillary litigation as

"disputed."  Upon the resolution of any objections to the Final Claim Determination Report, the

Court will enter a final judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure

with respect to the claims that are the subject of the Final Claim Determination Report, other

than the disputed claims that are the subject of ancillary litigation.  With respect to any claims

that are the subject of the Final Claim Determination Report as approved by the Court, the

Receiver shall be barred from commencing any clawback or other ancillary litigation against that

claimant and shall be also be barred from otherwise seeking any affirmative recovery from that

claimant.  The Receiver's use of any judgment entered in connection with the Final Claim

Determination Report shall be limited to its use for offset purposes in connection with the

Receiver's final claim determination and distributions.

## Distributions

(13)     If and when the Court issues an Order approving the Final Claim Determination

Report as submitted or modified by the Court, the Receiver will post that Order upon her

website.  After the time for any appeals of that Order has expired, or the resolution of any such

appeals, the Receiver shall distribute the Receivership Assets according to the Court-approved

distribution formula to the extent that such distribution is practical in view of the needs of the

continued Receivership, including any pending Receivership litigation.

(14)     In the event that the Receiver determines that an interim distribution is in the best

interests of the Receivership Estate, the Receiver shall hold a reserve of the Receivership Assets

in an amount reasonably necessary to pay the costs of winding up the estate after distribution of

the assets; and to the extent that there remains litigation that has not been resolved when the

balance of the estate is ready for distribution, the Receiver shall hold an additional reserve of the Receivership Assets in the amount necessary to pay the costs, including the Receiver's fees and attorney's fees, of that remaining litigation as well as an amount necessary to account for amounts at issue in the litigation.  The distribution of any funds remaining after winding up of the Receivership Estate or resolution of litigation shall be distributed pursuant to the Court-approved distribution formula established herein unless otherwise ordered by this Court.

(15)     When Receivership Assets are distributed to the Partnership's investors, they shall be distributed according to the Forte Hybrid methodology as defined in the Receiver's Motion for an Order to Show Cause and an Order Approving Claims Bar Date, Claims Resolution Procedures, and Distribution Methodology and supporting memorandum of law ("Receiver's Motion").  Specifically, as proposed in the Receiver's Motion, 50% of the assets available for distribution shall be distributed in accordance with the "Rising Tide" methodology; and the remaining 50% of the assets available for distribution shall then be distributed in accordance with the "Net Investment" methodology, using each investor's adjusted claim amount as reduced by any Rising Tide distributions to allocate the remaining assets according to dollar amount lost.[1] For the reasons set forth in the Receiver's Motion, this hybrid of the Rising Tide and Net Investment methodologies for the distribution of the Receivership Assets is approved as equitable and fair under the circumstances presented herein.

_____
Paul S. Diamond, U.S.D.J.

_____
[1] Capitalized terms used in this Order that are defined or explained in the Receiver's Motion or supporting Memorandum of Law, such as "Rising Tide," "Net Investment," and "Clawback Claims," shall retain those meanings.